728 So.2d 896 (1999)
STATE of Louisiana, Applicant,
v.
Johnny GASS and Raymond Kunzman, Respondents.
Nos. 31,816-KW, 31,817-KW.
Court of Appeal of Louisiana, Second Circuit.
January 20, 1999.
*897 Peggy J. Sullivan, Louisiana Appellate Project, Counsel for Respondents.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Traci A. Moore, Assistant District Attorney, Counsel for Applicant.
Before NORRIS, WILLIAMS and STEWART, JJ.
NORRIS, Chief Judge.
Johnny Gass and Raymond Kunzman, separately convicted by unanimous juries of attempted armed robbery in violation of La. R.S. 14:64 & 14:27, were adjudicated second felony offenders pursuant to the Habitual Offender Statute, La. R.S. 15:529.1, and sentenced to less than the mandatory minimum. The State seeks review of the sentences as illegally lenient. We reverse and remand.

Facts
On August 8, 1997, Kunzman and Gass went out to a tank battery site owned by Petrol Industrial, Inc., where Gass's ex-stepfather, Clifton Brian, worked.[1] They admitted that they intended to knock him out and take his wallet. Brian was late that day, and the two men got tired of waiting for him and left. On their way out, they passed Brian. Early the next morning, Kunzman picked Gass up and the two men drove to the tank battery site to again wait for Brian.
When Brian arrived, he started to work and reportedly heard a voice in the bushes yell, "Hey." Brian stated that he turned around and yelled back, "Hey," did not see anybody, so turned back around. Gass admittedly came from behind the saltwater tank and hit Brian a couple of times with what Gass referred to as a "slapjack." Gass described this as a long piece of hard rubber folded over and tipped with a piece of brass. When it was unfolded it was about a foot and one-half to two feet long. Brian fought back, hitting Gass on the head with an oil gauge. During the fight, Gass's mask fell off and Brian recognized him, and said "Johnny, Johnny Gass, leave me alone, I don't have any money."
*898 Kunzman reported that Gass yelled for help so he came out from the bushes and grabbed Brian by the back of the neck. He could not, however, maintain a grip as Brian was wet and oily. Kunzman did state that he hit Brian three or four times with his fist, but denied ever hitting him with the slapjack. Kunzman stated that when Gass realized that Brian recognized him and that Gass was going to get caught, Gass started hitting Brian harder. Kunzman reported that he sat on Brian's back while Brian was on his hands and knees. Brian testified that Kunzman was trying to drown him.
Soon after Brian recognized him, Gass left the scene and ran to the car. Kunzman followed and the two men then left the area. Kunzman stated that he did not know what condition Brian was in when they left.
Kunzman and Gass both admitted that they intended to take Brian's wallet. In his statement to the police, which was played for the jury, Gass stated that he needed money and believed Brian always carried a lot. He stated that he did not try to get the wallet, but that was his intention. Gass additionally admitted that though he knew Brian, Kunzman did not. Kunzman reported that Gass had been talking about doing this for about a year and had told him that Brian always carried substantial amounts of money on him, from $5,000 to $10,000.
Brian testified that the defendants did try to take his wallet, and that when he pushed the wallet back into his pocket they jerked his hand and broke his finger. After the defendants left the scene, Brian reportedly crawled toward his truck, but could not get over the fence. He then flagged down Alvin Jackson, a pumper who worked in a neighboring field. Jackson testified that he stopped to help Brian. He called his supervisor, who sent down Billy McKenzie, who in turn had the supervisor call an ambulance and the police. Both men testified that Brian had been badly beaten and was bleeding. McKenzie testified that the ground where the incident had occurred was wet and slippery. He stated that Brian told the police that he lost his watch and a gauge line, but due to the condition of the area the police could not locate either item. McKenzie proceeded to look around the area and found the gauge line and a homemade club, or blackjack, which answered Gass's description of the weapon.
Brian was transported to the hospital in Vivian, and then transferred to LSU Medical Center (LSUMC). Darwin Jones, an investigator of the Caddo Parish Sheriff's Office, contacted Brian at LSUMC. He testified that Brian had several lacerations to his head, several large bruises with blood clots in them, several bruises to his stomach, his fourth digit on his left hand was fractured, and there was a cut to the thumb on his left hand.
The men were tried separately, and both were found guilty of attempted armed robbery by unanimous juries. They were subsequently adjudicated second felony offenders. Gass's previous felony was unauthorized use of a movable, and Kunzman's previous felony was unauthorized use of an access card in a felony amount. The sentencing hearing for the two men was then consolidated. The trial court stated that the range of penalty for attempted armed robbery under the habitual offender statute was 24.75 -99 years without benefit of probation, parole or suspension of sentence. The trial court then stated that the mandatory minimum sentence would be excessive and a deviation below it was appropriate. The court sentenced each defendant to 10 years hard labor, without benefit of probation, parole or suspension of sentence.
The state filed a motion to reconsider the sentence, which was denied, and then filed a writ with this court. The writ was granted and the case was docketed.

Applicable Law
The definition of criminal conduct and the provision of penalties for such conduct is a purely legislative function. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. Pursuant to this function, the legislature enacted the habitual offender statute, which has been held by our Supreme Court, on numerous occasions, to be constitutional. State v. Johnson, supra. Since that statute in its entirety is constitutional, the minimum sentences *899 it imposes on recidivists are presumed to be constitutional. Id.
The determination of an appropriate minimum sentence by the legislature should be afforded great deference by the judiciary. Id. While the judiciary is not without authority to declare a mandatory minimum sentence under the habitual offender law excessive under the facts of a particular case, this should be done only in those rare instances where there is clear and convincing evidence to rebut the presumption of constitutionality. Id.; See State v. Dorthey, supra; State v. Randleston, 96-1646 (La.10/4/96), 681 So.2d 936; State v. Sepulvado, 367 So.2d 762 (La.1979).
The trial judge may not rely solely upon the non-violent nature of the instant crime or prior crimes as sufficient evidence to rebut the constitutional presumption. State v. Johnson, supra. A record of nonviolent offenses can be a factor in a sentencing judge's determination that the minimum sentence is excessive, but it cannot be the only or major reason for such a determination. Id.
In order to successfully rebut the presumption that the mandatory minimum sentence is constitutional, a defendant must clearly and convincingly show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
Id. Additionally, in determining whether the defendant has met his burden, the trial judge must consider that the goals of the Habitual Offender Law are to deter and punish recidivism. Id.
Finally, it must be emphasized that the departure downward from the minimum sentence prescribed under the Habitual Offender Law should occur only in rare instances. Id. If the burden of clear and convincing evidence is met, the trial judge is not free to pronounce a sentence he feels appropriate under the circumstances, but is mandated to sentence the defendant to the longest sentence which is not constitutionally excessive, and must specifically articulate the reasons for this sentence. Id.

Discussion
The trial judge conducted a sentencing hearing at which Gass's mother, Bonnie Gass, and Kunzman testified, and Gass made a statement to the court. Additionally, the trial judge considered various letters sent to him on the defendants' behalf by friends and family members.
The trial judge reviewed the facts of the case, finding that both men had specific intent to rob the victim and the crime was premeditated. He also found that there was a certain cruelty to the victim. The defendants were armed with a dangerous weapon, but neither of them had a gun or a knife. While this is true, it does not alter their use of a hard-rubber brass-tipped bludgeon or make the incident one without a dangerous weapon.[2] The judge additionally stated that while Brian suffered no permanent injuries, he did incur serious head injuries, that both men hit him, and at one time Brian's head was in the oily, muddy, wet earth and he feared for his life. Additionally, the record shows that the scene of the crime was an isolated area with little traffic and the men, unsure of Brian's condition, left him in the mud.
The court further stated that Kunzman was on drugs at the time, that this was not justification and in fact constituted a separate criminal offense. The court did not mention that his prior felony conviction, and his misdemeanor offenses, were committed under the influence of drugs. The court also noted that both defendants were quickly apprehended and gave confessions, which suggests contrition for their acts; however, both pleaded not guilty.
The court also stated that neither defendant understood or contemplated that their *900 conduct would cause or threaten the degree of harm that it ultimately did to both themselves and their victim. He further stated that Gass acted under some degree of provocation due to his past relationship with Brian.
The court next stated that Kunzman was 26 and Gass 23, both dropouts and both from economically impoverished situations, both with prior felony convictions for nonviolent offenses not against the person; and both defendants were "young and immature." While these defendants may have lacked maturity, they do not necessarily qualify as "youthful offenders." See State v. Cox, 604 So.2d 189 (La.App. 2d Cir.1992); State v. Woods, 494 So.2d 1258 (La.App. 2d Cir.1986); State v. Denstell, 476 So.2d 931 (La.App. 2d Cir.1985); State v. Chance, 475 So.2d 69 (La. App. 2d Cir.1985).
The court finally stated that both men had tried to better themselves while incarcerated, that Gass was working on his GED and involved in church and that Kunzman had participated in the Moral Recognition program, graduated from the relations/domestic violence course, for which he is now a facilitator, attended religious training in the form of a correspondence course in Set Free Prison Ministry, and attended church. The court additionally stated that neither defendant had juvenile records, neither blamed his parents but accepted responsibility for their actions and both were "genuinely remorseful."
The court also recognized significant aggravating factors. The victim was considerably older than the defendants, was not in good health, and received a savage beating when he tried to fight back. Gass, the instigator, was motivated by anger and greed, while Kunzman was motivated by greed. Kunzman admitted drug use, a criminal history, and two theft incidents which did not result in convictions; additionally, Kunzman had been involved in a hit-and-run which he could not remember.
The trial judge also stated that despite their activities while incarcerated, neither men were rehabilitated and both needed further correctional treatment and that a lesser sentence would deprecate the seriousness of the crime. He found that both men needed to go to the Department of Corrections because of the gravity of their offense and their criminal backgrounds.
The court described the defendants, their backgrounds, and the circumstances of their crime in detail. It gave detailed reasons why both deserved leniency. Despite these reasons and the judge's obvious desire to show leniency to these particular defendants, he did not appear to be clearly convinced that these defendants were the type of habitual offenders who meet the rare criteria described in State v. Johnson, stating that he was unsure that the men deserved all the time and effort which he had devoted to their case. Unlike the defendant in State v. Johnson, whose crime of conviction was non-violent and prior CDS offenses which were essentially victimless, the instant offense was brutally violent and the predicate offenses resulted in property losses to others. Additionally, having been found guilty of attempted armed robbery, the men faced a maximum sentence as first time offenders of 49.5 years at hard labor without benefit of probation, parole or suspension of sentence.
In summary, though the trial judge set forth reasons which would support a sentence at the lower end of the range prescribed by the Habitual Offender Statute, the reasons did not support the result that a deviation was warranted. In short, the trial court did not articulate, and the defendants did not show by clear and convincing evidence, that they were the rare defendants envisioned by State v. Johnson for which the mandatory minimum sentence for attempted armed robbery as adjudicated second felony offenders was constitutionally excessive. State v. Johnson, supra.[3] As such, *901 this court vacates the sentence and remands this case for re-sentencing within the prescribed range.

Errors Patent
In reviewing the record for errors patent, it is noted that the trial judge did not give the defendants credit for time spent in actual custody prior to the imposition of sentence, as required by La.Code of Criminal Proc. Article 880. In re-sentencing the defendants, the sentencing judge should give them credit for time served.

Conclusion
We vacate the sentence and remand the case to the trial court for re-sentencing in accordance with this opinion.
VACATED AND REMANDED FOR RESENTENCING.
NOTES
[1] Brian was approximately 50 years old at the time.
[2] Notably, the Legislature has provided a mechanism for enhanced sentencing if a firearm is used. La.Code of Crim. Proc. art. 893.2. Therefore, the Legislature has statutorily factored in the issue of whether or not a firearm was used as opposed to another type of dangerous weapon.
[3] It is not uncommon for others in the same position as Gass and Kunzman to be sentenced to near the statutory minimum, or more. See, State v. Gayden, 452 So.2d 783 (La.App. 4th Cir.1984) (co-defendants sentenced to 20 and 25 years, slightly above the mandatory minimum sentence required at that time); State v. Anderson, 486 So.2d 783 (La.App. 1st Cir.1986) (sentenced to 50 years); State v. Sylvas, 558 So.2d 1192 (La.App. 1st Cir.1990) (sentenced to 25 years); State v. Young, 27,237 (La.App.2d Cir.8/23/95), 660 So.2d 548 (sentenced to the maximum, 99 years, due to aggravating circumstances); State v. Morgan, 96-0333 (La.App. 4th Cir. 9/9/96), 680 So.2d 1230 (appellate court found 16 years too lenient, remanded, defendant was re-sentenced to 20 years and appellate court again found that the reasons given for deviation below the mandatory minimum sentence were insufficient); Lewis v. Day, 97 0111 (La.App. 1st Cir. 2/20/98), 708 So.2d 1152 (sentenced in 1985 to 20 years, slightly above the mandatory minimum sentence required at the time).